**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| FRIENDS OF MERRYMEETING BAY, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Docket no. 2:11-cv-35-GZS ) |
| BROOKFIELD POWER US ASSET MANAGEMENT, LLC, et al., | ) ) ) |
| Defendants. | ) ) |

**ORDER ON RENEWED MOTION TO DISMISS**

Before the Court is Brookfield Power US Asset Management, LLC and Hydro Kennebec, LLC's (together, the "Defendants") Renewed Motion To Dismiss (ECF No. 133) ("Renewed Motion To Dismiss").[1]  As explained herein, the Court GRANTS IN PART and DENIES IN PART Defendants' Renewed Motion To Dismiss (ECF No. 133) on mootness grounds.  In accordance with District of Maine Local Rule 7(f), the Court determines that this matter can be decided without oral argument, and thus DENIES Defendant's Motion To Hear Oral Argument Pursuant To Local Rule 7(f) (ECF No. 140).

## I.    LEGAL STANDARD

The Constitution confines the federal courts' jurisdiction to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1.  An actual case or controversy must exist "at each and every stage of the litigation."  Connectu LLC v. Zuckerberg, 522 F.3d 82, 88 (1st Cir. 2008).  Litigation becomes moot when an actual case or controversy ceases to exist because "the issues presented are no longer live or . . . the parties lack a legally cognizable interest in the outcome."  Overseas

---

[1]  The Court acknowledges receipt of Plaintiffs' Notice Of Recent Authority Relevant To Defendants' Renewed Motion To Dismiss (ECF No. 142).

Military Sales Corp. v. Giralt-Armada, 503 F.3d 12, 17 (1st Cir. 2007) (internal quotation omitted). "If an event occurs while a case is pending that heals the injury and only prospective relief has been sought, the case must be dismissed." Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir. 1997); see also Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001) (stating that once a case becomes moot, dismissal is "compulsory"). However, a party asserting that a case should be dismissed as moot bears a heavy burden in showing that "it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 66 (1987) (quoting United States v. Phosphate Export Ass., Inc., 393 U.S. 199, 203 (1968)) (alteration in original).

Closely related to Article III mootness is "prudential mootness" arising from a court's ability to exercise discretion not to grant relief. Even where a case may not be moot in the strict Article III sense, a case may become "so attenuated that considerations of prudence and comity for coordinate branches of government counsel the court to stay its hand, and to withhold relief it has the power to grant." Chamber of Commerce of U.S. of Am. v. U.S. Dept. of Energy, 627 F.2d 289, 291 (D.C. Cir. 1980). As with Article III mootness, the inquiry under prudential mootness becomes whether "circumstances [have] changed since the beginning of the litigation that forestall any occasion for meaningful relief." Southern Utah Wilderness Alliance, 110 F.3d at 727.

The First Circuit has observed that it is appropriate to consider mootness challenges as challenges to a court's subject-matter jurisdiction, and that "[t]he proper vehicle for challenging a court's subject-matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1)." Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362-63 (1st Cir. 2001); see United Seniors Ass'n v. Philip Morris USA, 500 F.3d 19, 23 (1st Cir. 2007). While there are different types of attacks on

subject matter jurisdiction under Rule 12(b)(1), because the parties here do not challenge the authenticity nor the admissibility of the National Marine Fisheries Service Endangered Species Act Biological Opinion ("Biological Opinion" or "BO") and the accompanying Incidental Take Statement ("ITS") (ECF No. 133-2), the basis for and the documents considered by the Court under the mootness challenge, the procedure for the Court's analysis would not differ materially under either type of attack. See, e.g., Williamson v. Tucker, 645 F.2d 404, 412-15 (5th Cir. 1981) (cited approvingly in Valentin, 254 F.3d at 364 and providing the different levels of review in which a court may engage when evaluating a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)).

## II.  THE ENDANGERED SPECIES ACT

Congress has declared that the purpose of the Endangered Species Act ("ESA") is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).  Accordingly, when it was passed, the ESA represented "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  Under the ESA, "[v]irtually all dealings with endangered species, including taking, possession, transportation, and sale, were prohibited, except in extremely narrow circumstances."  Id. (internal citations omitted).  To further the protection afforded by the ESA, the statute includes a citizen suit provision, allowing interested persons to bring suit to force compliance with the ESA. Id. at 180-81; see also 16 U.S.C. § 1540(g).

Section 9 of the ESA makes it unlawful for any person to "take" any threatened or endangered species of fish or wildlife within the United States, unless an incidental take

statement is obtained pursuant to the consultation process in Section 7 of the ESA.[2]   16 U.S.C. §§ 1536, 1538.  If during the consultation process, the agency determines that an action is not likely to jeopardize the species, but is reasonably certain to result in the incidental take of a listed species, the agency provides an incidental take statement along with a biological opinion.  See 16 U.S.C. § 1536(a)(2).   An incidental take statement must specify the impact of the incidental taking on the species and "those reasonable and prudent measures that [the agency] considers necessary or appropriate to minimize such impact."   Id. §§ 1536(b)(4)(i)-(iv).   Further, an incidental take statement must "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the [reasonable and prudent measures]."   Id. § 1536(b)(4)(iv).   Finally, Section 7(o)(2) of the ESA states that "any taking that is in compliance with the terms and conditions specified in a written [incidental take] statement . . . shall not be considered to be a prohibited taking of the species concerned."   Id. § 1536(o)(2).   Accordingly, an incidental take statement constitutes authorization for a person to "take" an endangered species so long as the "take" is done in accordance with the "terms and conditions" specified by the agency.

## III.   BACKGROUND

In 2000, the National Marine Fisheries Service ("NMFS") and the United States Fish and Wildlife Service ("USFWS") (collectively, the "Services") issued a rule listing the Gulf of Maine Distinct Population Segment ("GOM DPS") of Atlantic salmon endangered under the ESA. (Substituted Complaint (ECF No. 20) ¶ 19.)  On June 19, 2009, the Services issued a final rule including the Atlantic salmon populations of the Kennebec, Androscoggin and Penobscot Rivers in the GOM DPS, thereby formally designating those populations of Atlantic salmon as

---

[2]  Although not material to this case, the ESA also provides for incidental take permits under section 10 of the ESA. See 16 U.S.C. § 1539.

endangered under the ESA.  (Id. ¶ 20.)  In their Substituted Complaint, Plaintiffs Friends of

Merrymeeting Bay and Environment Maine allege that the Kennebec and Androscoggin Rivers

historically had the largest Atlantic salmon runs in the United States, estimated at more than

100,000 adults each year.  (Id. ¶ 15.)  Now, the numbers of adult Atlantic salmon returning to

these rivers is perilously low.  (Id.)  For example, in 2010, only five adult Atlantic salmon

returned to the Kennebec River.  (Id.)

Defendants, on their own or through a subsidiary, own, operate and hold the Federal

Energy Regulatory Commission ("FERC") license for the Hydro Kennebec hydroelectric dam

("Hydro Kennebec dam") located on the Kennebec River.  (Id. ¶¶ 8, 9.)  In their Substituted

Complaint, Plaintiffs allege that the Hydro Kennebec dam kills, harms and harasses endangered

Atlantic salmon in numerous ways:  the dam kills and injures Atlantic salmon when the fish pass

through the turbines; the dam impedes upstream and downstream fish passage, which in turn

prevents those Atlantic salmon from accessing spawning and rearing habitat; and, the dam alters

the natural habitat of Atlantic salmon to the point that the essential behavior patterns of the fish

are impaired, among other negative consequences.  (Substituted Compl. ¶ 1.)  Plaintiffs claim

that Defendants are violating the ESA by killing, harming and harassing Atlantic salmon through

the operation of the Hydro Kennebec dam.  (Id. ¶¶ 1, 27-29.)

Plaintiffs filed their initial Complaint (ECF No. 1) on January 31, 2011.  On June 2,

2011, Plaintiffs filed their Substituted Complaint (ECF No. 20) against Defendants asserting

causes of action under the Endangered Species Act (Count I) and the Clean Water Act (Count

II).  Specifically, in Count I, Plaintiffs claim that Defendants are currently taking endangered

Atlantic salmon through the operation of the Hydro Kennebec dam in violation of the ESA.

Plaintiffs further allege that Defendants "have neither an incidental take permit nor an incidental

take statement authorizing their take of Atlantic salmon at [the] Hydro Kennebec dam."
(Substituted Compl. ¶ 28.)  In Count II, Plaintiffs claim that Defendants are violating the Clean
Water Act through the operation of that dam.

In response to the alleged violations of the ESA, Plaintiffs request that the Court
"[d]eclare Defendants to be violating the take prohibition of" the ESA.  (Id. Relief Requested ¶
a.)  Plaintiffs also request that Defendants be ordered to: (1) adhere to a specified schedule in
preparing a biological assessment, a first step in obtaining an incidental take statement, (2)
"prevent Atlantic salmon from swimming into operating turbines at [the] Hydro Kennebec dam
unless authorized by an ITP or ITS," and (3) "implement other appropriate measures to comply
with the ESA's take prohibition pending the issuance of any ITP or ITS."  (Id. Relief Requested
¶ d.).

Prior to Plaintiffs' filing of this case, Defendants began the process of working in
consultation with the Services and FERC toward the obtainment of an incidental take statement
pursuant to Section 7 of the ESA.[3]  (Biological Opinion at 6.)  On September 17, 2012, the ESA
consultation process for the Hydro Kennebec dam concluded with the NMFS's issuance of a
Biological Opinion ("BO") that included the ITS.  The BO is "based on a review of the best
available scientific and commercial information."  (Id. at 7.)  After over sixty pages of analysis
and review, the BO concludes that operation of the Hydro Kennebec dam pursuant to the four
year interim species protection plan, "may adversely affect but is not likely to jeopardize the
continued existence of the GOM DPS of Atlantic salmon."[4]  (Id. at 66.)

---

[3]  Specifically, on January 5, 2011, Defendant Hydro Kennebec LLC requested that it be designated as the non-
federal representative for the purpose of informal consultation under the ESA, and, on January 31, 2011, Defendant
Hydro Kennebec LLC submitted a preliminary draft biological assessment ("BA").  (Biological Opinion at 6.)  On
April 6, 2012, the draft BA was filed with FERC.  (Id. at 13.)

[4]  The BO includes authorization of a four year interim species protection plan ("ISPP").  (Biological Opinion at 13.)
Under the ISPP, Defendants will be required to design and install upstream fish passage facilities and undertake

The BO contains the ITS for the Hydro Kennebec dam, which authorizes a specific level of Atlantic salmon takings at the Hydro Kennebec dam and exempts those takings from liability under the ESA.  (Id. at 66-69.)  Under the ITS, Defendants will be required to implement "reasonable and prudent measures" to minimize and monitor the incidental taking of Atlantic salmon at the dam.  (Id. at 67-68.)  The measures include annual monitoring and reporting "to confirm that [Defendants are] minimizing incidental tak[ings] and reporting to NMFS any project-related observations of dead or injured salmon."  (Id. at 68.)  The ITS also contains specific terms and conditions that must be followed for Defendants to be exempt from the takings prohibitions of the ESA.  (Id.)  If the level of incidental taking is exceeded, agency consultation will be reinitiated and the reasonable and prudent measures will be reviewed.  (Id.)

The same day that Defendants received the BO and ITS, they moved to dismiss the Substituted Complaint as moot.  Defendants assert that the issuance of the ITS, exempting operations at the Hydro Kennebec dam from liability under the ESA, renders Plaintiffs' claims under the ESA and the Clean Water Act moot.  Plaintiffs have opposed that motion, arguing that despite the issuance of the BO and ITS, a live case or controversy remains before the Court.

## IV.    DISCUSSION

The Court readily concludes that Defendants have met their heavy burden of showing mootness in conjunction with Plaintiffs' claims for injunctive and declaratory relief under the Endangered Species Act.  Count I of Plaintiffs' Substituted Complaint is predicated on the allegation that Defendants do not have an ITS.  (See Substituted Compl. ¶ 28 ("Defendants have

---

studies to evaluate the effectiveness of current measures for protecting Atlantic salmon.  (Id.)  During this four-year period, information gained regarding the survival levels necessary to recover the Atlantic salmon will be used to develop long-term protection measures.  (Id.)  The ISPP is designed to be adaptive.  Accordingly, if early study results reveal a deficiency, Defendants must work with NMFS to correct that deficiency.  (Id.)  Under the ISPP, Defendants will meet with NMFS annually to discuss study results and potential modifications to the ISPP and the Hydro Kennebec dam.  (Id.)

neither an incidental take permit nor an incidental take statement authorizing their take of Atlantic salmon at Hydro Kennebec dam.").)   This foundational fact changed when NMFS issued its BO and ITS on September 17, 2012 and fundamentally altered the circumstances of this litigation.

The ITS issued by NMFS exempts from liability any taking of Atlantic salmon that is in accord with the ITS from the issuance of the ITS to 2016.  (Biological Opinion at 64-76.)  See also Ramsey v. Kantor, 96 F.3d 434, 441 (9th Cir. 1996) (providing that Section 7(o) "indicates that any taking-whether by a federal agency, private applicant, or other party-that complies with the conditions set forth in the incidental take statement is permitted.")   Plaintiffs even acknowledged in their Substituted Complaint that the issuance of an ITS would exempt Defendants from liability under the ESA.  (See Substituted Compl. ¶ 2 ("The ESA allows the [NMFS] and [USFWS], under certain circumstances, to authorize an otherwise prohibited taking of an endangered species if such taking is 'incidental' to, and not the purpose of, the carrying out of an otherwise lawful activity."); see also Pls.' Opp'n To Brookfield's Renewed Mot. To Dismiss (ECF No. 134) at 3 ("Brookfield will be insulated from future ESA take liability for the life of the ITS, *so long as it complies with those conditions*.") (alteration in original).)  Case law confirms that the issuance of the ITS renders Plaintiffs' ESA claim moot.  See Oregon Wild v. Connor, No. 6:09-CV-00185-AA, 2012 WL 3756327 at **2-3 (D. Or. Aug. 27, 2012) (declaring claims under Section 9 of the ESA moot because "[t]he actions challenged by plaintiff in its second claim for relief have been explicitly authorized by NMFS under Section 7, and are no longer even allegedly 'wrongful.'); Oregon Natural Res. Council v. Bureau of Reclamation, No. 91-6284-HO, U.S. Dist. LEXIS 7418 at **24-25 (D. Or. April 5, 1993) (stating that "FWS's issuance of the biological opinion on the long-term operation of the Project, and the adoption of

that opinion by the Bureau, moots plaintiffs' ESA claims."); <u>Southern Utah Wilderness Alliance v. Madigan</u>, No. 92-1094-LFO, 1993 WL 19650 at *1 (D.D.C. Jan. 6, 1993) (dismissing as moot claims under ESA Section 9 because the Fish and Wildlife Service issued incidental take statements along with its biological opinion).

Plaintiffs' request for injunctive relief for Count I is similarly based on now outdated facts.  First, Plaintiffs request that the Court order Defendants to prepare a BA according to a specified schedule.  (Substituted Compl. Requested Relief ¶ d.)  On April 6, 2012, Defendants' draft BA was filed with FERC.  (Biological Opinion at 13.)  Second, Plaintiffs request that the Court order Defendants to "prevent Atlantic salmon from swimming into operating turbines at [the] Hydro Kennebec dam *unless authorized by an ITP or ITS*" and to "implement other appropriate measures to comply with the ESA's take prohibition *pending the issuance of any ITP or ITS*."  (Substituted Compl. Requested Relief ¶ d (emphasis added).)  Defendants now have a valid ITS based on the "best available scientific and commercial information" that contains "reasonable and prudent measures" designed to minimize and monitor the incidental taking of Atlantic salmon at the Hydro Kennebec dam.  (Biological Opinion at 7, 67-68.)   In the Substituted Complaint, Plaintiffs request only prospective relief and that requested relief has been provided through the issuance of the BO and ITS.  Therefore, Plaintiffs' request for injunctive relief is now moot.  For the same reasons that injunctive relief is not available, a declaratory judgment is also not available.

Moreover, the core of Plaintiffs' complaint is that Atlantic salmon, an endangered species, are being taken at the Hydro Kennebec dam without an incidental take statement in violation of the ESA.  Plaintiffs' claimed injury has been healed by the issuance of the ITS.  There is no grievance left in the Substituted Complaint for the Court to remedy.  Therefore, the

issuance of the BO and ITS resolves Plaintiffs' injury, renders Plaintiffs' ESA claim moot and "forestall[s] any occasion for meaningful relief." Southern Utah Wilderness Alliance, 110 F.3d at 727.

Plaintiffs advance two arguments in an attempt to keep their ESA claim alive. First, Plaintiffs assert that the Court could award injunctive relief to remedy past alleged takings of Atlantic salmon at the Hydro Kennebec dam. Specifically, Plaintiffs ask the Court to use the conservation recommendations in the ITS, which are not mandatory obligations, to fashion injunctive relief "for the purpose of remediating the harm caused by [Defendants'] unlawful past takes of Atlantic salmon." (Pls.' Opp' to Brookfield's Renewed Mot. To Dismiss (ECF No. 134) at 12.) In support of this argument, Plaintiffs point to U.S. Public Interest Research Group v. Atlantic Salmon of Maine, LLC, 339 F.3d 23 (1st Cir. 2003), where *after* the district court issued an injunction to remedy violations of the Clean Water Act, the Maine Board of Environmental Protection issued a permit for the challenged activity that had less stringent requirements than the injunction issued by the district court. Id. at 27. In upholding the injunction, the First Circuit stated, "the court may grant additional injunctive relief governing the post-permit operations of the companies *insofar as the court is remedying harm caused by their past violations*." Id. at 31 (alteration in original). Here, Plaintiffs ask the Court to follow Atlantic Salmon and grant injunctive relief to remedy alleged past violations of the ESA.

Even assuming that the Hydro Kennebec dam did take Atlantic salmon in violation of the ESA prior to the issuance of the ITS and that the Court retained jurisdiction over an ESA claim that occurred wholly in the past, the Court would decline to issue further injunctive relief. In Atlantic Salmon, at the time the district court issued the injunction, the permit had not yet been issued. 339 F.3d at 27. That is not the case here. Instead, the Court has before it an extensive

Biological Opinion "based on a review of the best available scientific and commercial information." (Biological Opinion at 7.) Contained within the BO and the ITS are "reasonable and prudent measures [that are] necessary and appropriate to minimize and monitor incidental take of Atlantic salmon at the Hydro-Kennebec Project." (Id. at 67-68.) In this situation, the Court will defer to a coordinate branch of government and its well-researched and reasoned conclusions. Accordingly, even assuming the Court has jurisdiction, the Court stays its hand and declines to issue injunctive relief.

Second, Plaintiffs argue that Defendants may not comply with the conditions in the ITS. However, an alleged failure to comply with the terms of the ITS is not the case before the Court. Instead, the Substituted Complaint repeatedly states that Defendants do not have an ITS or ITP authorizing the alleged taking of Atlantic salmon in violation of the ESA. (See Substituted Compl. ¶¶ 2, 28, 53, Requested Relief ¶ d.) Following issuance of the ITS, Plaintiffs have not moved to amend their Substituted Complaint to state a claim for relief in view of the newly issued ITS. Accordingly, there is no claim that would provide a basis for relief for violation of the ITS in Plaintiffs' Substituted Complaint.

Moreover, should Defendants fail to follow the terms of the ITS, including if Defendants exceed the authorized amount of takings of Atlantic salmon, then certain provisions contained within the ITS itself are invoked. For example, "[i]f, during the course of the action, the level of incidental take is exceeded, reinitiation of consultation and review of the reasonable and prudent measures are required." (Biological Opinion at 68.) The ITS also contains an annual monitoring and reporting program "to confirm that [the Hydro Kennebec dam] is minimizing incidental tak[ing] and reporting to NMFS any project-related observations of dead or injured salmon made by [the dam]." (Id.) Since before Plaintiffs filed this action, Defendants have diligently

attempted to comply with the requirements and process for obtaining an ITS.   (See, e.g., Biological Opinion at 6-7.)  Defendants' actions and the existence of an ITS render Plaintiffs' ESA claim moot.   Because Count I of Plaintiffs' Substituted Complaint has become moot, dismissal is "compulsory."   See Cruz, 252 F.3d at 533.   Therefore, Count I of Plaintiffs' Substituted Complaint is DISMISSED.

## V.     CLEAN WATER ACT

In their Renewed Motion To Dismiss, Defendants assert that the issuance of the ITS "will clearly resolve any subordinate concerns under other statutes" – apparently referencing Count II of Plaintiffs' Substituted Complaint – without citation to any legal authority for that proposition. (Renewed Mot. To Dismiss (ECF No. 133) at 4 n.6.)  Instead, Defendants cite to the record on summary judgment.  In Defendants' Reply To Plaintiffs' Opposition To Brookfield's Renewed Motion To Dismiss (ECF No. 136), Defendants attempt to introduce new evidence and argue that the Clean Water Act claim should be dismissed based on arguments advanced by Defendants in their summary judgment papers.  (Id. at 5-7; see also Defs.' Mot. For Summ. J. (ECF No. 106) at 14-15.)  In Plaintiffs' Motion To Strike Portions Of Reply Brief And Proffered Evidence Or, In The Alternative, For Leave To File Surreply (ECF No. 137) ("Plaintiffs' Motion To Strike"), Plaintiffs object to the introduction of the new evidence and arguments that go to the merits of the CWA claim.   In short, the Court agrees that the introduction of the new evidence and arguments that address the merits of the claim are not appropriate on this motion to dismiss and declines to consider that evidence or those arguments.  Accordingly, Plaintiffs' Motion To Strike is GRANTED.   Defendants have provided the Court with no basis to dismiss Count II of Plaintiffs' Substituted Complaint based on the present Renewed Motion To Dismiss.  Therefore, Defendants' Renewed Motion To Dismiss is DENIED as to Count II.

## VI.   CONCLUSION

For the reasons explained herein, Defendants' Renewed Motion To Dismiss (ECF No. 133) is GRANTED as to Count I but DENIED as to Count II.  Additionally, Defendants' Motion To Hear Oral Argument Pursuant To Local Rule 7(f) (ECF No. 140) is DENIED and Plaintiffs' Motion To Strike (ECF No. 137) is GRANTED.


SO ORDERED.

/s/ George Z. Singal
United States District Judge


Dated this 14th day of January, 2013.